CALABRIA, Judge.
Respondent-mother and respondent-father (collectively, "respondents" or the "parents") appeal from an adjudication order concluding that J.D. ("Jim")[1] was a neglected juvenile and a disposition order concluding that it was in his best interest to remain in the custody of the Cumberland County Department of Social Services ("DSS"). After careful review, we reverse the orders of the district court.
I. Factual and Procedural Background
The instant action stems from a report DSS received on 12 September 2016 concerning the safety of Jim and his three siblings, T.T., ("Tony"),[2] Z.A.D. ("Zion"), and R.D. ("Ron"). At the time, all four children lived with respondents, who are married. On the day of the report, which was a Monday, respondent-father dropped off Jim at school and spoke to his pre-K teacher privately. Jim had bruising and red marks on his face in the shape of a handprint. Respondent-father told the teacher that the marks were a result of Jim hitting himself during a tantrum on the previous Friday night, 9 September 2016. Later in the day, Jim told his teacher than he hit himself; however, on the playground, Jim told a different teacher that respondent-father hit him.
DSS initiated an investigation into the incident on the same day. A DSS social worker interviewed respondents, and both denied that either had struck Jim. They told the social worker that on 9 September 2016, Jim became upset, was sent to his room, and had a "meltdown" which culminated in Jim hitting himself in the face. Jim wanted a snack, and after respondent-mother refused to give him the snack, he became upset, was yelling and screaming, and was then sent to his bedroom. Respondent-father had been outside, but came inside the house after hearing Jim's yelling and screaming. He went into Jim's bedroom, tried to put a nighttime diaper on Jim, and Jim began hitting himself. Respondent-father told the social worker that Jim had a history of self-injury and tantrums, and that his typical way of dealing with Jim's meltdowns was to speak in a calm, monotone voice and give him a "bear hug," which respondent-father did on the night of the incident. Respondent-father walked out of the room, told his family that Jim caused the self-injury to his face, and also indicated that Jim was blaming him for the injury. He and Jim were alone when the incident happened.
According to respondents, a family friend, who is a registered nurse, was visiting respondents on the night of the incident. She examined Jim's injuries, did not see any broken bones or broken skin, and instructed respondents to use an ice pack and witch hazel, an anti-inflammatory compound, on Jim's face. Respondents did not take Jim to a physician.
Following the initial investigation on 12 September 2016, the DSS social worker developed a safety plan for the family. Respondent-father agreed to leave the home temporarily during DSS and law enforcement investigations of the incident.
Both Jim and his older brother Tony were interviewed at the Child Advocacy Center on 21 September 2016. According to DSS, Jim stated that his dad was sad because he hit himself, but Jim did not want to talk about what happened. Tony stated that Jim throws tantrums and commented that DSS chose to believe a four-year-old instead of an adult.
DSS also scheduled a Child Medical Examination ("CME") for 3 October 2016. During the CME, Danielle Thomas-Taylor, M.D. interviewed Jim and conducted a physical examination. Dr. Thomas-Taylor is a pediatrician who specializes in child abuse forensic pediatric medicine. Jim asserted that respondent-father hit him and made the marks on his face. Dr. Thomas-Taylor noted that Jim was cooperative, attentive, and easily re-directed. However, when respondent-mother entered the room, Jim's behavior changed-he became defiant, uncooperative, and immature. Based on the CME, the pediatrician's opinion was that Jim's injuries were consistent with physical abuse by his father.
On 6 October 2016, DSS filed a petition alleging that Jim, Tony, Zion, and Ron were abused, neglected, and dependent juveniles. With regard to neglect, the petition alleged: the juveniles did not receive proper care, supervision, or discipline from the juveniles' parents; and the juveniles lived in an environment injurious to the juveniles' welfare. The petition was based on the investigation that began on 12 September 2016, as well as the forensic interview and CME. Additionally, DSS alleged that Jim had a history of aggressive behavior and self-injury dating back to the 2014-15 school year at his previous preschool. Beginning at age two, Jim had bitten children on a few occasions and attempted to kick a teacher. However, the school never made recommendations to respondents or asked them to leave the school. Jim's then-current school reported that he became easily frustrated and did not transition well from one activity to another, but had not observed any self-injurious behavior. The petition further alleged respondents had previously sought therapy for Jim but discontinued it after Jim's therapist took medical leave in June 2016.
On the same day the juvenile petition was filed, the trial court entered an order giving DSS nonsecure custody of Jim, and he was placed in foster care. The other three children remained in respondents' custody.
Following a hearing, the trial court entered an order on 23 March 2017 concluding that Jim was a neglected juvenile based solely on respondents' failure to provide necessary medical care for Jim. This adjudication was based on findings that respondents failed to provide Jim with mental health treatment for an approximately three-month time period prior to the 9 September 2016 incident, despite Jim having a history of explosive and self-injurious behavior, as well as their failure to seek medical treatment for Jim's injuries on 9 September 2016. The trial court declined to make a finding that respondent-father was responsible for the injuries to Jim's face following the 9 September 2016 incident. The trial court dismissed all of the allegations in the petition as to Tony, Zion, and Ron, and it dismissed the allegations of abuse and dependency pertaining to Jim.
The dispositional hearing was continued. At the time of the dispositional hearing, Jim had been on a trial home visit for approximately one month. Nonetheless, in an order entered on 18 April 2017, the trial court concluded that it was in Jim's best interest to remain in DSS custody. Respondents appeal.
II. Evidentiary Rulings
Respondent-mother and respondent-father have filed separate briefs in which they raise similar issues challenging the trial court's adjudication of neglect, findings of fact made by the trial court, and several evidentiary rulings made by the trial court. Because the issues raised by both parents are substantially the same, we consider them together in our analysis.
A. Findings of Fact
Review of a trial court's adjudication of dependency, abuse, and neglect requires a determination as to (1) whether clear and convincing evidence supports the findings of fact, and (2) whether the findings of fact support the legal conclusions. In re Pittman , 149 N.C. App. 756, 763-64, 561 S.E.2d 560, 566 (2002) (citation omitted). "In a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." In re Helms , 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (citations omitted).
We first turn to respondents' challenges to the findings of fact. The trial court made the following findings of fact in support of its conclusion that Jim was a neglected juvenile based on failure to receive necessary medical treatment:
12. On the night of the incident, 9/09/16, the Respondent Mother and Respondent Father [ ] did not take the child to the doctor despite the injury; instead a family friend, who was a[n] R.N. at Cape Fear Valley Hospital, who was also present in the home at the time recommended that the child be treated at home since there was no apparent broken skin or bones.
13. The Respondent Mother and Respondent Father [ ] admitted that following the incident on 9/09/16, ice packs and the anti-inflammatory compound (Witch Hazel) was applied to the child's injured face.
....
21. Respondent Mother and Respondent Father [ ] admitted that [Jim] was referred to Clark Clinic for therapy but discontinued treatment due to the provider being on FMLA during the month of June 2016. No subsequent therapy or treatment was obtained until after the incident on 9/9/16 when the juvenile was injured.
....
23. On 9/12/16, Respondent Mother and Respondent Father [ ] admitted that [Jim] was not receiving mental health treatment despite the parents having a reported history of self-injurious behavior and [Jim] blaming others for the injuries. That [Jim's] therapy ended sometime in May or June of 2016.
24. That although several witnesses testified to [Jim's] explosive behaviors and meltdowns the Respondent Parents went on a family vacation and did not begin to pursue any medical treatment until they returned sometime in August, 2016.
25. That [Jim] did not receive medical treatment or therapy despite the Respondent Parents' testimony that [Jim] had self-injurious behaviors.
....
28. As to the juvenile [Jim] only, the Court found that [Jim] was in fact a neglected juvenile, pursuant to statute, but that the evidence presented did not rise to the level of Abuse or Serious Neglect, and the Court dismissed as to those allegations. The Court declines to find that [Jim] was abused and that as it relates to [Jim], the Court finds that this incident, among others, along with the failure of the parents to ensure that [Jim] received continuous and appropriate care for his issues constitutes neglect of [Jim].
Of these findings, respondents challenge finding of fact 25 as lacking in evidentiary support. Respondents argue that the evidence refutes this finding, and we agree. In finding of fact 25, the trial court found that Jim did not receive medical treatment or therapy. This finding is directly contradicted by findings of fact 21 and 23, in which the trial court found that Jim had been receiving therapy, but that it stopped in May or June 2016 after the therapist took FMLA leave. Given these findings, there is no evidentiary support for a finding that Jim did not receive any medical treatment or therapy. We therefore disregard finding of fact 25 in determining whether the trial court's order supports a conclusion of neglect.
Respondent-mother also purports to challenge the evidentiary basis of many of the remaining findings cited above. She contends that the unrefuted evidence shows that respondents had been seeking treatment for Jim's behavioral issues. The findings she challenges, however, are supported by competent evidence from the hearing. We therefore decline to strike the remaining findings. Nonetheless, we note respondent-mother's argument goes more to the issue of whether the findings of fact support a conclusion that Jim was medically neglected, and we address this argument in the section that follows.
B. Neglected Juvenile
For purposes of an abuse, neglect, or dependency action, our Juvenile Code defines a "neglected juvenile" as:
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care ; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare[.]
N.C. Gen. Stat. § 7B-101(15) (2015) (emphasis added). This Court has consistently required that "there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline in order to adjudicate a juvenile neglected." In re McLean , 135 N.C. App. 387, 390, 521 S.E.2d 121, 123 (1999) (internal quotations and emphasis omitted).
Here, the trial court's sole basis for finding neglect was the conclusion that respondents failed to provide necessary medical care for Jim. The court did not find failure to provide proper care, supervision, or discipline. Nor did it find that Jim lived in an environment injurious to his welfare or that respondent-father was responsible for Jim's injuries to his face following the 9 September 2016 incident. Thus, the only possible bases for the neglect finding are the following: (1) that the parents failed to seek appropriate treatment for Jim's facial injuries following the 9 September 2016 incident; or (2) that the parents failed to seek therapy for Jim's behavioral issues during the summer of 2016. For the reasons that follow, we conclude that neither amounts to medical neglect.
We first turn to the parents' treatment of Jim's face following the 9 September 2016 incident. Given the facts surrounding the injury, we conclude that neither findings of fact 12 and 13, nor the evidence surrounding the treatment of Jim's facial injury, support a conclusion that respondents neglected Jim by failing to provide medical treatment. Jim was hit in the face and sustained bruising as a result. Both his mother, who is a former army medic, and a registered nurse examined his injuries immediately after they occurred and concluded that ice and an anti-inflammatory compound were sufficient treatment. Jim did not have any broken skin or bones, he did not complain of any pain, and the type of injury he sustained did not necessitate evaluation for a potential head injury. Although the bruising lasted several days, neither school officials nor the DSS social worker suggested medical treatment for the acute injury-Jim's interview at the Child Advocacy Center occurred nine days later and was taken for the purpose of determining who had caused the injuries, not for acute treatment. Furthermore, the bruising healed on its own, and the marks were not evident by the time of the CME on 3 October 2016.
Our Supreme Court has held that a parent's conduct must be viewed on a case-by-case basis on the totality of the evidence. See Speagle v. Seitz, 354 N.C. 525, 531, 557 S.E.2d 83, 86 (2001), cert. denied, 536 U.S. 923, 153 L.Ed.2d 778 (2002). Here, respondents relied on their own parental and medical knowledge, along with that of a registered nurse, and provided Jim with an appropriate home remedy. The injury healed properly such that none of the investigating authorities sought medical evaluation for the injury itself. When viewed under the totality of the circumstances, we cannot say that respondents' response to the injury constitutes neglect.
Next, we turn to the trial court's findings regarding respondents' failure to provide Jim with continuous treatment for his behavioral issues. Respondents argue that the findings of fact do not support a finding of medical neglect. Respondent-father argues that there was only a short gap in Jim's therapy, and that this Court has previously sustained a finding of medical neglect only where there is a complete refusal by the parents to provide necessary treatment. Both parents argue that DSS failed to prove, and the trial court failed to find, a sufficient nexus between the gap in treatment and any possible impairment. For the reasons that follow, we agree.
Our Supreme Court has stated that "... not every act of negligence on the part of parents or other care givers constitutes 'neglect' under the law and results in a 'neglected juvenile.' " See In re Stumbo , 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (where a report of a two-year-old naked in his driveway did not amount to neglect). Additionally, we have previously found neglect where parents completely refused to provide their children with medical care or treatment. In re Huber , 57 N.C. App 453, 458, 291 S.E.2d 916, 919, appeal dismissed and disc. review denied , 306 N.C. 557, 294 S.E.2d 223 (1982) ; see also In re Bell , 107 N.C. App. 566, 569-70, 421 S.E.2d 590, 592 (1992) (parents refused to send children to day care, where they could receive supervision, nutrition, and medical care); In re Thompson , 64 N.C. App. 95, 101, 306 S.E.2d 792, 795-96 (1983) (where parent refused to allow a child to be evaluated to determine if she is developing normally and to receive recommended treatment). Here, however, the parents did not completely refuse medical treatment.
DSS and the guardian ad litem ("GAL") argue that Jim's failure to attend therapy in the two months leading up to the 9 September 2016 incident is sufficient to sustain the trial court's conclusion that Jim was neglected, and that the lack of therapy resulted in Jim's self-injury on 9 September 2016. Appellees' assertion is sheer speculation. Neither DSS nor the GAL proffered any expert testimony, let alone any evidence, that the gap in therapy caused Jim's meltdown. Nor did any expert suggest that Jim's behavioral issues were so severe that the family was required to forego a summer vacation. Therefore, this inference cannot support a finding of medical neglect. Moreover, none of the parties suggest that Jim exhibited any concerning behavior in the months or weeks leading up to the meltdown even after therapy was discontinued. Lastly, Dr. Thomas-Taylor, who completed the CME of Jim, neither expressed concern regarding Jim's behavioral issues nor recommended therapy.
The evidence shows that the family had experienced and were dealing with concerns over Jim's behavior and meltdowns prior to DSS's involvement with the family, despite the fact that neither preschool officials nor primary care pediatricians expressed similar concern. Respondents sought out counseling for Jim, and in November 2015, Jim was evaluated by the Child and Family Assistance Center at Womack Hospital, with respondent-mother's chief complaint being "possible behavioral issues." Jim was diagnosed with unspecified attention deficit hyperactivity disorder, and therapy was recommended.
The evaluator noted that Jim was not exhibiting risk factors, such as suicidal ideation or the desire to harm himself or others. After the initial evaluation, Jim received therapy until June 2016, when his therapist went out on FMLA leave. Respondent-mother implemented practices she learned from his therapist and proactively took a parenting class prior to DSS's involvement with the family.
The evidence further shows that in addition to Jim's therapist taking medical leave, the family went on a summer vacation for approximately two months. Respondent-mother testified that they returned home in August 2016, and she then began attempting to find Jim another counselor. Respondent-mother testified that both she and her husband are full-time students, and she was attempting to settle all of the school schedules before she resumed Jim's counseling. Respondent-mother located another counselor in September, and Jim had an appointment with the new counselor at some point between the 9 September 2016 incident and the CME on 3 October 2016. During the same time period, Jim saw a primary care pediatrician, who referred him to a specialist for his hyperactivity.
The undisputed findings demonstrate that Jim was receiving therapy from approximately November 2015 to June 2016 and that the only reasons for respondents' suspension of Jim's therapy were his counselor's medical leave and the family's vacation. DSS failed to offer any evidence of an immediate medical need that would dictate a change in the family's vacation plans. Under these facts, the parents' actions do not amount to complete failure to obtain necessary medical treatment, and therefore do not amount to neglect. Accordingly, we reverse the trial court's adjudication order.
III. Conclusion
In conclusion, we find that the trial court erred in concluding that Jim was a neglected juvenile based on respondents' failure to provide medical treatment. Because the trial court found no other basis for neglect, we reverse the trial court's adjudication order.[3] Without a sufficient adjudication order, the disposition order cannot stand. We likewise reverse the trial court's disposition order.
Because we have reversed the trial court's orders, we need not address respondents' remaining arguments on appeal, which pertain to evidentiary rulings made during the adjudication hearing.
REVERSED.
Report per Rule 30(e).
Judges DAVIS and TYSON concur.

Pseudonyms are used throughout this opinion for ease of reading and to protect the identity of J.D. and other juveniles.

Tony is Jim's older half-brother from respondent-mother's previous marriage.

DSS asks this Court to consider whether the evidence supports neglect by inappropriate discipline or improper care. However, the proposal of an alternative basis in law for supporting the trial court's order is governed by N.C.R. App. P. 10(c) (2015), which provides that "[w]ithout taking an appeal, an appellee may list proposed issues on appeal in the record on appeal based on any action or omission of the trial court that was properly preserved for appellate review and that deprived the appellee of an alternative basis in law for supporting the [order]." DSS failed to submit its alternative bases for supporting the order in the proposed issues on appeal contained in the record. Nor does its brief comply with requirements for doing so contained in N.C.R. App. P. 28(c). Instead, in a one-sentence statement in its brief, DSS essentially asks this Court to make its own independent neglect determination. Even if DSS had brought this argument forward properly, the trial court made no findings which would support improper discipline or improper care. Therefore, DSS essentially asks this Court to reweigh the evidence and make new evidentiary findings, which is not the function of this Court. Accordingly, we decline to consider DSS's request.